UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WINSTON BOYD** | **CIVIL ACTION** |
| **VERSUS** | **SEC.:** |
| **ANN KIRKPATRICK, in her Official Capacity as SUPERINTENDENT of the NEW ORLEANS POLICE DEPARTMENT; NOPD OFFICER PITTMAN; NOPD OFFICER WINK; JAMES PORTER; CHRISTOPHER DURING, JOSHUA MCBURNIE, OMAR RODRIGUEZ, CHRISTOPHER LAINE, RASAAD RAMIE, THOMAS RIPP, JACK WILSON, JAMES BRADY, ADEJA CARTER; THE CITY OF NEW ORLEANS through MAYOR LATOYA CANTRELL** | **JUDGE**<br><br>**MAGISTRATE JUDGE**<br><br>**JURY DEMAND** |

## PETITION FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, comes **WINSTON BOYD ("PETITIONER")** who respectfully represents as follows:

### PRELIMINARY STATEMENT

This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983, 1988 and the Fourth and Fourteenth Amendments to the U.S. Constitution. This matter also raises supplemental state law claims, relative to the actions[1] of all named defendants herein; more specifically, **NOPD OFFICERS PITTMAN, JAMES PORTER, CHRISTOPHER DURING, JOSHUA MCBURNIE, OMAR RODRIGUEZ, CHRISTOPHER LAINE, RASAAD RAMIE, THOMAS RIPP, JACK WILSON, JAMES BRADY, ADEJA CARTER (Collectively**

---

[1] When the terms "actions" or "acts" are used herein, it is intended to also include the failure to act, *i.e.,* commissions.

referred to herein as "the NOPD OFFICERS"); ANN KIRKPATRICK, in her Official Capacity as SUPERINTENDENT of the NEW ORLEANS POLICE DEPARTMENT ("NOPD"); and THE CITY OF NEW ORLEANS through its duly elected MAYOR, LATOYA CANTRELL (All Defendants collectively referred to herein as "the DEFENDANTS").

## JURISDICTION & VENUE

This cause is grounded in 28 U.S.C. § 1331 *et seq.* and §§ 1343(a)(3), 1343(a)(4), and 1367(a) as this suit raises questions of federal civil rights law and is also brought pursuant to 42 U.S.C. § 1983 *et seq.* and other related provisions. This action is authorized by 42 U.S.C. §1981, *et seq.*, especially §1983, to redress the deprivation under color of law, statute, ordinance, regulation, custom, and/or usage of rights guaranteed to **PETITIONER** by the Fourth and Fourteenth Amendments to the United States Constitution.

**PETITIONER** brings this action in this Court pursuant to 28 U.S.C. § 1391(b), as the transactional events constituting the alleged tortious behavior arose and occurred within Orleans Parish, Louisiana, which is situated in the Eastern District of Louisiana. This action is in conformity with Fed. Rules Civ. P. Art. 4(d). **PETITIONER** also seeks all relief afforded under state law, including, but not limited to, La. Civil Code Article 2315.

Collectively, the **DEFENDANTS** have acted as tortfeasors and are therefore liable both jointly and *insolido*, as their acts committed under color of the statutes, customs, ordinances, and usage of the State of Louisiana, Parish of Orleans, and the City of New Orleans, by depriving **PETITIONER** of his rights secured by the Constitution and laws of the United States.

## PARTY PLAINTIFF

1. **WINSTON BOYD ("PETITIONER")** is of suitable age and capacity to file this lawsuit. At all times relevant herein, **PETITIONER**, was a resident of the City of New Orleans situated in Orleans Parish which is the Eastern District of Louisiana.

### PARTY DEFENDANTS

2. **NOPD OFFICER PITTMAN ("the K-9 Handler")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD and who, upon information and belief, is responsible for the handling of the K-9 involved in this case. Upon further information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

3. **NOPD OFFICER WINK ("Wink")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, Wink was an on-duty officer who participated in the incident that gives rise to this lawsuit by placing handcuffs on **PETITIONER** while the K-9 involved in this case was biting **PETITIONER**. Wink was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

4. **JAMES PORTER ("the K-9 Supervisor")** is being sued in his individual capacity as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, he was the K-9 Supervisor who failed to supervise the improper, unleashed deployment of the K-9 involved in this case and failed to ensure compliance

with proper procedures, including completing a K-9 incident bite report regarding the grossly negligent K-9 bite inflicted on **PETITIONER**.

5. **CHRISTOPHER DURING ("DURING")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

6. **JOSHUA MCBURNIE ("MCBURNIE")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

7. **OMAR RODRIGUEZ ("RODRIGUEZ")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

8. **CHRISTOPHER LAINE ("LAINE")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise

to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

9. **RASHAAD RAMIE ("RAMIE")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

10. **THOMAS RIPP ("RIPP")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

11. **JACK WILSON ("WILSON")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

12. **JAMES BRADY ("BRADY")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times

relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

13. **ADEJA CARTER ("CARTER")** is being sued in their individual capacity, as a Law Enforcement Officer employed by the NOPD. Upon information and belief, and at all times relevant herein, they were an on-duty officer who participated in the incident that gives rise to this lawsuit and was acting under color of state law in performance of their duties and under color of the statutes, ordinances, regulations, policies, customs, and uses of the NOPD.

14. **ANN KIRKPATRICK ("KIRKPATRICK"),** is being sued in her official capacity as the Superintendent of the NOPD. As the chief law enforcement officer for the City of New Orleans, NOPD Superintendent **KIRKPATRICK** is responsible for the staffing, supervision, administration, policies, practices, procedures, and customs of the NOPD. She is responsible for the hiring, supervision, discipline, and control of the NOPD staff, supervisors, and officers. She is the employer of the NOPD officer(s) involved as defendant(s) in this lawsuit and is liable both directly and vicariously for the actions of said NOPD officer(s) complained of herein. NOPD Superintendent **KIRKPATRICK** is also responsible for the policies, procedures, training, assignments, supervision and discipline of the NOPD deputies who are authorized and assigned to work both "on-duty" or "off-duty" and is accountable for their actions. At all times relevant herein, she was the final policymaker and/or decision maker regarding law enforcement training, supervision, rules, regulations, and procedures of the NOPD. In her official capacity, NOPD Superintendent

KIRKPATRICK represents a public entity organized in the State of Louisiana the provides services to the citizens of the City of New Orleans.

15. **THE CITY OF NEW ORLEANS** through its duly elected Mayor, LATOYA CANTRELL, is a municipal entity and political subdivision situated in Orleans Parish, organized under the laws of Louisiana and the United States of America.

## STATEMENT OF FACTS

16. On the night of January 22, 2024, at or around 10:30 p.m., **PETITIONER** was in his garage at his home located at 3030 Hamilton St., New Orleans, Louisiana. His wife, Erica Vanshander Buckner Boyd, was inside their home working.[2]

17. **PETITIONER** sat in one of his chairs in the garage, with a machete placed on another for protection, as their neighborhood was known to be dangerous. While in the garage, **PETITIONER** heard a distant announcement warning that a police K-9 would be released if a surrender did not occur. The announcement was repeated twice, but it was far enough away that **PETITIONER** did not perceive any immediate concern, and he eventually fell asleep in the chair.[3]

18. **PETITIONER** was abruptly awakened when a police K-9 bit his leg. No audible warning was given immediately before the dog attacked him. The dog was not on a leash at the time and continued to bite despite the handler commanding it to release. The K-9 handler repeatedly shouted "Louse" at increasing intensity, struggling to get the dog to stop. While

---

[2] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd; Exhibit P-2: Photograph of the Boyd Home; Exhibit P-4: Photograph of Garage.
[3] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd; Exhibit P-3: Photograph of Winston Boyd Sitting in Garage.

the handler had his hand on the dog's collar, the dog persisted, painfully biting **PETITIONER's** leg multiple times. [4]

19. Earlier that evening, at or around 8:00 p.m., a police officer wearing a patrol uniform and body camera had approached **PETITIONER** in his yard and asked if he resided at the location. **PETITIONER** clarified that he was on his own property. Winston Boyd was told he was okay to move about his property by the NOPD officer. At no time did NOPD officers warn PETITIONER that a K-9 would be released to seek out a suspect they were searching for regarding an earlier reported carjacking.[5]

20. Counsel for **PETITIONER** later obtained an incident report from the NOPD detailing the circumstances surrounding this encounter.[6] According to the report attached herein as Exhibit P-5, the NOPD was investigating a reported suspect described as, "B/M…tall slim build…all blk clothing." A second description provided, "B/M…Red hoodie…with white stripes." At 7:09 p.m., a call was made requesting K-9 apprehension, and K-9 handler, **NOPD OFFICER PITTMAN**, was notified of this request at or around 7:26 p.m. A K-9 search began at 8:55 p.m. Prior to this, a third description was called in of another black male, wearing a "white T-shirt…grey long sleeve…jeans." Upon information and belief, this description was relative to **PETITIONER**.

21. During the dog attack, an NOPD officer wearing black tactical gear handcuffed **PETITIONER** while the K-9 continued to bite his leg. Upon information and belief, this NOPD officer was named Officer Wink. The bite lasted what felt like three to five minutes, during which NOPD officers interrogated **PETITIONER**. The dog continued to bite

---

[4] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd.
[5] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd.
[6] Exhibit P-5: PremierOne Incident Details.

multiple times, including toward **PETITIONER's** groin, leaving him with three sets of puncture wounds.[7]

22. At approximately 9:58 p.m., the NOPD incident report notes an incident at **PETITIONER's** address, 3030 Hamilton St., which required EMS assistance. Meanwhile, at 10:23 p.m., a suspect was apprehended at 3018 Hamilton St., which is not **PETITIONER's** address.[8]

23. **PETITIONER's** wife heard the commotion and shouts to get the dog off her husband. Although she could not see the incident until rushing outside, she estimates the dog was on **PETITIONER's** leg for three to five minutes. During that time, she repeatedly urged the officers to stop the attack, but to no avail.

24. Eventually, the K-9 handler stated, "We have the dog off, and all his parts are intact," as **PETITIONER** lay bleeding on the floor, having been pulled off the chair by the K-9 during the attack.[9]

25. After the dog was removed, **PETITIONER** was placed in an ambulance by New Orleans EMS and taken to University Medical Center (UMC), to receive medical treatment. His injuries, which included puncture wounds and nerve damage to his knee, were treated with cleaning, stitching, and bandaging. **PETITIONER** was prescribed Amoxicillin and Ibuprofen before being discharged. He was also advised that his bite wounds and knee injury, causing pain when walking, would require follow-up appointments.[10]

---

[7] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd.
[8] Exhibit P-5: PremierOne Incident Details.
[9] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd.
[10] Exhibit P-8: Certified Copy of University Medical Center Medical Records for Winston Boyd.

26. EMS confirmed the "puncture wound above knee from dog bite," classifying the event as a trauma case.[11]

27. Following the incident, **PETITIONER** was interviewed by an NOPD Public Integrity Bureau (PIB) Officer, who recorded the interview and had crime scene investigators take photos of **PETITIONER's** injuries. **PETITIONER's** wife was not interviewed, and no communication or correspondence has been received since this interview of **PETITIONER**.[12]

28. **PETITIONER**, a middle school reading teacher at KIPP Leadership in New Orleans, took four days off work to recover. Since returning to work, he continues to suffer from nerve damage in his leg and severe mental distress. He is currently receiving mental health treatment from Dr. Oyemate, a psychiatrist, for trauma related to the incident. **PETITIONER's** wife, Erica, and their child are also undergoing therapy for trauma stemming from the event.

### CAUSES OF ACTION

**Count One:  Constitutional and Civil Rights Claims under 42 U.S.C. 1983 and the U.S. Constitution against the NOPD and Officers**

29. **PETITIONER** incorporate and reasserts the allegations in the paragraphs above as though fully set forth herein.

30. The actions of the **NOPD OFFICERS** in using excessive and unreasonable force in the seizure and restraint of **PETITIONER**, and in failing to intervene or act to prevent such actions, despite having the opportunity and duty to do so, as set forth herein, violated the rights of the **PETITIONER**, as guaranteed under the Fourth and Fourteenth Amendments

---

[11] Exhibit P-5: PremierOne Incident Details.
[12] Exhibit P-1: Unsworn Statement of Petitioner, Winston Boyd.

to the U.S. Constitution, to liberty, due process, equal protection, to be free from unreasonable seizure and to be free from the unjustifiable and excessive use of force, all in violation of 42 U.S.C. § 1983.

31. The **NOPD OFFICERS** had knowledge of the wrongs done and conspired to be done as described herein, had the power to prevent or aid in the prevention of same, yet failed or refused to do so, in violation of 42 USC § 1983.

32. During the events described herein, the **NOPD OFFICERS** were aware of the use of excessive force and restraint but did not intervene to prevent the violation of **PETITIONER'S** constitutional rights, even though they had the opportunity and duty to do so.

33. At all times relevant herein, the **NOPD OFFICERS** committed the acts described herein under the color of state law and by virtue of their authority as law enforcement officers of the NOPD and in the course and scope of their employment and substantially deprived **PETITIONER** of his clearly established rights, privileges and immunities guaranteed to him as a citizen of the United States pursuant to the Fourth and Fourteenth Amendments in violation of 42 U.S.C. 1983, including, but not limited to:

    a.  The right to freedom from unreasonable seizure;

    b.  The right to freedom from the use of unreasonable, unjustified, and excessive force and summary punishment;

    c.  The right to freedom from deprivation of liberty without due process of law;

    d.  The right to freedom from arbitrary governmental activity which "shocks the conscience" of a civilized society in violation of his substantive due process rights;

34. The actions of the **NOPD OFFICERS** described herein were the direct and proximate cause of the injuries inflicted upon **PETITIONER.**

35. The actions of the **DEFENDANTS** described herein were done with deliberate indifference and were intentional, malicious, reckless, cruel and performed with malice.

**Count Two:    Constitutional and Civil Rights Claims Against Superintendent of the NOPD, Ann Kirkpatrick, in her Official Capacity**

36. **PETITIONER** incorporates and reasserts the allegations in the paragraphs above as though fully set forth herein.

37. The actions of the **NOPD OFFICERS** described herein violated **PETITIONER's** federal and state constitutional and statutory rights as specified herein and resulted in **PETITIONER** sustaining physical and mental damages.

38. At all times relevant herein, each of the **NOPD OFFICERS** named and involved in the constitutional and statutory violations, which resulted in the **PETITIONER** sustaining severe physical and mental damages, were employees of NOPD Superintendent **KIRKWOOD**, were acting under color of law by virtue of their authority as NOPD Officers and were in the course and scope of their employment.

39. As a direct and proximate result of the actions of the NOPD Officers and the deliberately indifferent policies, practices and customs of NOPD Superintendent **KIRKWOOD**, the constitutional and statutory rights of **PETITIONER**, both federal and state, were violated, and he sustained injuries and damages suffered for which the defendants are liable, as more fully set forth herein.

40. NOPD Superintendent **KIRKWOOD**, in her official capacity and as final policy maker, was under a constitutional duty: 1) to properly determine if her officers, including the **NOPD OFFICERS** were qualified to serve as police officers; 2) to provide her officers,

including the **NOPD OFFICERS**, with proper policy guidance to perform law enforcement functions including stops, seizures, apprehension of suspects, reasonable use of force, including the use and deployment of a police K-9, and the protection of individual's civil rights, among other things; and 4) to properly investigate, discipline and hold accountable her deputies, including the **NOPD OFFICERS**, for violation of the policies, practices and customs of the NOPD.

41. **PETITIONER** avers that NOPD Superintendent **KIRKWOOD** failed to properly screen, hire, train, investigate and discipline officers, including the **NOPD OFFICERS**.

42. NOPD Superintendent **KIRKWOOD** permitted, encouraged, tolerated, and knowingly acquiesced in an official pattern, practice or custom of NOPD officers, including the **NOPD OFFICERS** of violating the constitutional rights of the public at large, including **PETITIONER.**

43. The actions of the NOPD officers as described herein, were unjustified, unreasonable, unconstitutional, excessive and grossly disproportionate to the actions of **PETITIONER,** and constituted an unreasonable seizure effectuated through the use of excessive force and a deprivation of the **PETITIONER's** constitutional rights secured to him by the Fourth and Fourteenth Amendment of the United States Constitution.

44. The actions of the NOPD officers as described herein, were in direct violation of the constitution, law and regulations of the United States and the State of Louisiana and the internal policies and procedures of the SPD.

45. NOPD Superintendent **KIRKWOOD** condoned, approved, ratified, facilitated and knowingly acquiesced in the actions of the **NOPD OFFICERS** described herein by failing

to properly investigate, discipline and hold accountable the NOPD Officers for their actions.

46. NOPD Superintendent **KIRKWOOD** is liable for the unconstitutional actions of the **NOPD OFFICERS** as described herein, due to the following policies, procedures, rules, practices, customs and/or usages of NOPD which, upon information and belief, were in effect and being utilized at the time of this incident and which were the moving force of the constitutional violations which caused the injuries sustained by **PETITIONER:**

   a. Failure to properly hire and screen applicants to determine their fitness, both mentally, physically and ethically, to perform the duties of a law enforcement officer;

   b. Failure to have adequate and proper written policy guidance regarding obvious and recurring law enforcement activities with respect to: 1) stops; 2) seizures; 3) use of force; 4) use of K-9 units; and 5) protection of individual's civil rights;

   c. Failure to adequately train officers, including the **NOPD OFFICERS**, regarding obvious and recurring law enforcement activities with respect to: 1) stops; 2) seizures; 3) use of force; 4) use of K-9 units; 5) protection of individual's civil rights; and, 6) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including **PETITIONER**;

   d. Failure to train and educate officers, including the **NOPD OFFICERS**, with respect to appropriate levels of force application which NOPD Superintendent **KIRKWOOD** knew, must have known or should have known, that officers were utilizing in the field and which posed a serious risk of injury including the improper use of a K-9 unit, in deliberate indifference to and reckless disregard of the welfare of the public at large, including **PETITIONER**;

   e. Failure to adequately supervise, monitor and evaluate the performance of her officers, including the **NOPD OFFICERS**, regarding their compliance with the laws and policies, practices and customs with respect to: 1) stops; 2) seizures; 3) use of force; 4) use of K-9 units; 5) protection of individual's civil rights; and, 6) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including **PETITIONER**;

    f.   Failure to adequately respond to and investigate critical incidents and/or complaints by civilians regarding misconduct by NOPD Officers, including the **NOPD OFFICERS**, with respect to: 1) stops; 2) seizures; 3) use of force; 4) use of K-9 units; 5) protection of individual's civil rights; and, 6) among other things, illustrating deliberate indifference and reckless disregard for the rights of the public, including **PETITIONER**;

    g.   Failure to adhere to NOPD Standard Operating Procedures concerning K-9 safety and use. Specifically, NOPD SOP 1.3 and SOP 41.22 outline strict guidelines on the deployment of K-9 units, including requirements for prior warnings, appropriate use of force, and proper documentation of incidents. The NOPD did not issue a warning to Winston Boyd before releasing a K-9, as required by the policies. Additionally, the involved K-9 handler did not activate their body-worn camera or properly document the incident, which violates the department's established protocols for use of force and canine deployment. These failures indicate a breach of internal regulations meant to safeguard both officers and civilians.[13]

    h.   Failure to meet training requirements for their K-9 units as specified in their policies. Each K-9 team is mandated to participate in a minimum of one 8-hour in-service training day per week, along with an additional four hours of maintenance training documented in a canine logbook. The NOPD failed to ensure that the K-9 involved in Winston Boyd's incident received this requisite training. Furthermore, there was no maintenance of daily training logs, which is critical for tracking the proficiency and readiness of K-9 teams. The lack of adequate training and documentation raises concerns about the competency of the K-9 unit and its preparedness to handle real-life situations, thereby contributing to the injuries sustained by Boyd.

    i.   Failure to conduct an internal investigation into the dog bite incident involving Winston Boyd, violating its duty to prevent similar future occurrences. This failure also reflects non-compliance with a Federal Consent Order mandating thorough reporting, investigation, and maintenance of bite statistics for K-9 incidents. Additionally, NOPD did not ensure that the K-9 and its handler, including K-9 Supervisor Sgt. James Porter, were properly screened, certified, and recurrently trained. These systemic lapses in oversight and accountability led to the improper deployment of the K-9, which ultimately caused harm to Boyd. The absence of an investigation further suggests a disregard for implementing necessary corrective actions to mitigate risks associated with K-9 operations.

---

[13] Exhibit P-6: NOPD Operations Manual Chapter 1.3, Use of Force; Exhibit P-7 NOPD Operations Manual Chapter 41.22, Canine.

47. NOPD OFFICERS violated the following portions of NOPD Operations Manual Chapter

41:22, Title: Canine (Exhibit P-7) policy as follow:

- **POLICY STATEMENT**
  1. A police canine is primarily a locating tool, using its extraordinary olfactory skills to find a concealed subject. The use of the canine as a force tool, that is to bite a suspect at the time the suspect is located, may or may not be necessary or justified.

  2. When a canine is used in an attempt to apprehend a suspect, it is an instrumentality of force and shall only be used consistent with Chapter 1.3 – Use of Force, applicable laws, and current professional standards as set out in this Chapter. Chapter 1.3 – Use of Force requires that officers shall use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the member or others. As applied to canines, the reasonable-necessity standard means a dog bite is justifiable, lawful force if and only if the threat to officers or the public is serious—the need for force must be sufficient to justify the injury of a dog bite.

  3. Canine teams will be trained and will demonstrate proficiency such that the handler has total control over the canine's actions.

- **DEPLOYING A CANINE**
  7. Off-leash canine deployments, searches, and other instances when there is an increased risk of a canine bite to a suspect shall be restricted to instances in which the suspect is wanted for a crime of violence and the suspect poses an imminent danger of death or serious bodily injury to the officer or to another person.

  8. Off-leash tactical canine deployments, searches, and other instances in which there is an increased risk of a canine bite shall be used only in instances in which the suspect is wanted for a crime of violence as defined in this Chapter or is reasonably suspected to be armed based upon individualized information specific to the subject. Officers are not authorized to deploy a canine off leash in order to subdue a suspect who presents no imminent threat of death or serious injury. Off-leash tactical deployment of a canine is never authorized for the protection of property.

- **ALLOWING A CANINE TO BITE**
  13. Canine handlers will only allow their canines to bite a suspect if:
    (a) the suspect's actions pose a risk of imminent danger to the handler

(c) the suspect is exhibiting aggressive resistance as defined in Chapter 1.3 – Use of Force. (Aggressive resistance does not include concealment and refusal to surrender without more); AND

(d) the handler is in visual and auditory range of a suspect, except when the suspect is hiding in a confined space (e.g., a crawl space) and refuses to surrender or is escaping.

14. Handlers will not allow their canine to engage a suspect by biting if a lower level of

- **TACTICAL USE – REQUESTS FOR USE OF CANINE**
  15. Personnel within the Department are encouraged to freely request the use of the canines. When a canine team is requested, the on-scene officers shall:
  (a)   Secure the perimeter of the area to be searched and clear the area of civilians;

- **TACTICAL USE - CANINE WARNING ANNOUNCEMENT**
  24. Prior to all canine deployments, the handler shall:
  (a) Ensure his/her body-worn camera is activated before the warning is given and         before deployment of the canine;…
  (c) Unless warnings impose an imminent threat of danger to the canine handler or other officers on scene, issue three (3) loud and clear warnings that a canine will be deployed and advise the suspect to surrender. For example: "Warning, a police canine will be used to search this (area to be searched), if you don't come out, I will release my dog. If approached by the dog, surrender and remain still";…
  (f) Provide a reasonable amount of time for innocent civilians, other members, and the suspect to come out before commencing with the search.
  (g) Whether or not there is an apprehension, document in the deployment report and any related incident report whether a verbal canine warning was given and, if none was given, the reasons why.

25. Whenever possible, two canine handlers should respond to any request for a canine. When two handlers respond to a request for a service, the primary handler shall search with his/her canine and the secondary handler shall act as backup without his/her canine. If a question arises as to which handler shall be primary, the approving supervisor shall designate the primary handler.…

29. Canine handlers shall allow their canines to engage a suspect by biting only if:
  (a) The suspect's actions pose a risk of imminent danger to the handler or others; the suspect's actions pose a risk of serious harm to the canine; or the suspect is exhibiting aggressive resistance as defined in NOPD Chapter 1.3 – Use of Force. (Aggressive resistance does not include concealment and refusal to surrender without more); and

(b) The handler is in visual and auditory range of a suspect, except when the suspect is hiding in a confined space (e.g., a crawl space) and refuses to surrender or is escaping.

(c) Handlers will not allow their canine to engage a suspect by biting if a lower level of force could reasonably be expected to control the suspect or allow for the apprehension.

30. When a canine apprehends a suspect by biting, the handler shall call the canine off at the first moment the canine can be safely released, considering that the average person will struggle if seized or confronted by a canine. The handler shall order the dog to release the bite immediately after it is determined that the suspect is unarmed, regardless of whether the suspect is struggling with the dog.

- **TACTICAL USE - REPORTING AND INVESTIGATING CANINE DEPLOYMENTS**

37. A canine deployment resulting in a bite is considered a serious use of force and a Level 4 reportable use of force. All serious use of force shall be investigated by PIB FIT....

39. For each canine apprehension, the involved handler and all witness officers, which includes the officer requesting the use of the canine, shall complete a Force Statement before the end of shift. In addition to the information that must be included in all Force Statements, a canine handler's narrative documenting a canine apprehension shall include the following:

(a) The name of the approving supervisor;

(b) The item number assigned to the body-worn camera video and any other associated item numbers;

(c) Whether the deployment was on- or off-leash;

(d) Whether there was contact between the canine and the subject, including contact with the subject's clothing;

(e) Whether the canine was on or off leash at the time of apprehension;

(f) A description of where the subject was located;

(g) Documentation of the duration of the canine's contact with a subject;

(h) The approximate distance of the canine from the handler at time of apprehension;

(i) The description of any injuries received by the suspect;

(j) The description of the circumstances leading up to the decision to deploy the canine; and

(k) A description of the canine release and securing of the canine.

- **CANINES IN PUBLIC AREAS**

87. When not specifically deployed pursuant to this Chapter, all canines shall be kept on
leashes when in areas that allow access to the public. Exceptions to this rule would include specific law enforcement operations for which the canines are trained or approved demonstrations.

88. Canines shall not be left unattended in any area to which the public may have access.

48. NOPD OFFICERS violated the following portions NOPD OPERATIONS MANUAL

CHAPTER 1.3, TITLE: USE OF FORCE (Exhibit P-6) policy as follows:

- **Serious Use of Force**—Includes the following: (a) All uses of lethal force by an NOPD officer; (b) All critical firearm discharges by an NOPD officer; (c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization; (d) All neck holds; (e) All uses of force by an NOPD officer resulting in a loss of consciousness; (f) All canine bites (g) More than two applications of an CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive; and (h) Any strike, blow, kick, CEW application or similar use of force against a handcuffed subject.
- **USE OF FORCE LEVELS** – For reporting and investigative purposes, the New Orleans Police Department categorizes use of force by its members into four (4) primary force levels:
  **LEVEL 4** Level-4 uses of force include all 'serious uses of force' as listed below:
  (a) All uses of lethal force by an NOPD officer;
  (b) All critical firearm discharges by an NOPD officer;
  …
  (f) All canine bites;
- **USE OF FORCE PRINCIPLES**
  6. NOPD officers, regardless of the type of force or weapon used, shall abide by the following requirements:
  (a) Officers shall use verbal advisements, warnings, and persuasion, when possible, before resorting to force.
  …
  (e) When possible,

- **DEADLY FORCE**
  13. **Deadly/Lethal force shall be used only when:**
      (a)    There is an imminent danger of death or serious physical injury to the officer or another person;
- **LEVELS OF CONTROL**
  21. If verbal commands/directives are ineffective or not feasible, officers may utilize other control methods. If force is necessary, officers shall determine which control technique(s), tactics or authorized defensive equipment would best de-escalate the incident and bring it under control in the safest manner. When it is objectively reasonable, officers may utilize the following skills and techniques as follows:
  …

**Page 19 of 25**

(h) **Deadly or Lethal Force**—Deadly/Lethal force shall be used only when:
    i. There is an imminent danger of death or serious physical injury to the officer or another person; or
    ii. To prevent the escape of a fleeing subject if there is probable cause to believe:
    - The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death; and
    - The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person.

49. NOPD Superintendent **KIRKWOOD** knew or should have known that the above-referenced policies, practices, and/or customs, resulted in an under qualified, undertrained and unprofessional law enforcement agency that was ill-equipped to perform obvious and necessary law enforcement activities without exposing the public to unwarranted danger of injury and bodily disfigurement.

50. NOPD Superintendent **KIRKWOOD** was on actual or constructive notice of the deficiencies with the policies, practices, and/or customs of the NOPD which make officer misconduct a foreseeable consequence.

51. NOPD Superintendent **KIRKWOOD** must have known or should have known that the above-referenced policies, practices, and/or customs, would likely lead to serious injury or permanent bodily disfigurement of citizens and that such injuries were foreseeable; yet disregarded that risk.

52. The aforementioned policies, practices and customs were inadequate in relation to the specific tasks their deputies must routinely perform and with respect to activities where there is an obvious need for proper policies, practices and customs and therefore, illustrated its deliberate indifference and/or reckless disregard to the consequences of officer misconduct.

53. NOPD Superintendent **KIRKWOOD's** above referenced policies, practices and/or customs violated **PETITIONER's** constitutional rights; and said policies, practices and/or customs were the moving force behind and proximate cause of said violations.

54. NOPD Superintendent **KIRKWOOD's** above referenced policies, practices and/or customs demonstrated a deliberate indifference to the constitutional rights of the public, including **PETITIONER**, and was the proximate cause of the injuries and damages sustained by **PETITIONER**, and evidenced a reckless or callous indifference to the federally protected rights of **PETITIONER**.

55. NOPD Superintendent **KIRKWOOD** is also directly responsible for the actions of NOPD officers described herein, including the **NOPD OFFICERS**, by virtue of the fact that she failed to require or perform an adequate investigation of this critical incident involving the bodily injury and psychological trauma inflicted upon **PETITIONER**. Therefore, NOPD Superintendent **KIRKWOOD** effectively ratified, condoned, and otherwise approved the **NOPD OFFICERS** conduct in this matter and in all respects.

56. By failing to recognize or correct the deficiencies with her policies, practices and customs, NOPD Superintendent **KIRKWOOD** consciously disregarded the known and foreseeable consequences thereof.

57. NOPD Superintendent **KIRKWOOD's** deliberately indifferent policies, practices and customs were the moving force behind **PETITIONER's** injuries and the deprivation of his constitutional rights.

58. There is a direct causal link between the policies, practices and customs and the violation of the **PETITIONER's** constitutional rights.

59. As a direct and proximate result of the foregoing policies, practices and customs of NOPD Superintendent **KIRKWOOD**, the violation of the constitutional rights of the public by the NOPD Officers was substantially certain to occur.

60. The actions of the NOPD Officers described herein, which were proximately caused by the policies, practices, customs and usages of NOPD Superintendent **KIRKWOOD** were the underlying cause of **PETITIONER's** injuries.

**Count Four:  Violation of the Louisiana Constitution and State Laws against all Defendants in all Capacities**

61. **PETITIONER** incorporate and reasserts the allegations in the paragraphs above as though fully set forth herein.

62. The actions of the **NOPD OFFICERS** as described herein, were done with negligence, gross negligence and/or intentionally and were arbitrary, capricious and unreasonable, in violation of Louisiana constitutional and statutory law.

63. The actions of the **NOPD OFFICERS** as described herein resulted in the assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, loss of liberty, and violation of the rights to be secure against unreasonable stops, seizures, the unjustifiable and excessive use of force, and the right to due process of law.

64. The actions of the **NOPD OFFICERS** caused or contributed to the physical and mental injuries sustained by **PETITIONER**. By virtue of their professional roles and by answering the call for service, the **NOPD OFFICERS** had a duty to exercise due care.

65. The actions and omissions of the **NOPD OFFICERS** herein were within the course and scope of their employment and NOPD Superintendent **KIRKWOOD** is vicariously liable for their acts and omissions in accordance with Louisiana law.[14]

---

[14] La. Civil Code Art. 2320.

## CAUSATION

66. The actions of the **NOPD OFFICERS** described herein, were the proximate cause of the injuries and damages suffered by **PETITIONER** and as a result, has sustained injury and suffered damages as set forth herein.

67. The **DEFENDANTS** are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, conspiring, committing and/or ratifying or condoning the commission of the above-described acts.

68. The actions of the **DEFENDANTS** described herein were negligent, grossly negligent, intentional, arbitrary, capricious and unreasonable and/or deliberately indifferent.

69. The actions and omission of the **DEFENDANTS** as described herein, were intentional malicious, reckless and performed with malice entitling **PETITIONER** to a substantial award of punitive damages.

## DAMAGES

70. As a direct and proximate result of the **DEFENDANTS** wrongful acts and omissions as described herein, **PETITIONER** suffered severe injuries, for which he now seeks and is entitled to recover damages from all the **DEFENDANTS**, jointly and severally, for these injuries, to the fullest extent possible, under both federal and state law, as follows:

    j. **PETITIONER, Winston Boyd**, suffered severe physical, mental and emotional injuries, pain and suffering, anguish, loss of liberty, loss of enjoyment of life, as well as fear and terror of death.

### JURY TRIAL REQUESTED

71. **PETITIONER** requests a jury in this case as to all portions of this matter to which a jury trial is available.

## PRAYER FOR RELIEF

**WHEREFORE, PETITIONER, Winston Boyd**, prays that after due proceedings are had, that there be judgment in his favor and against all **DEFENDANTS**, jointly and severally, as follows:

1. Compensatory Damages;

2. Past, Present and Future Pain and Suffering;

3. Past, Present and Future Mental Anguish

4. Past, Present and Future Medical Expenses;

5. Loss of Enjoyment of Life;

6. Inconvenience;

7. Disfigurement;

8. Humiliation;

9. Punitive damages;

10. Reasonable attorney's fees and all costs of these proceedings pursuant to 42 U.S.C. § 1988;

11. Judicial interest from the date of judicial demand;

12. Declaratory relief and judgment that the acts complained of herein were unconstitutional;

13. That this matter be tried by a jury;

14. All other relief which this Honorable Court may deem just and proper.

**PETITIONER, Winston Boyd**, further reserves his right to notice of defect to this pleading and reserve the right to amend or supplement this Complaint after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

Respectfully Submitted,

/s/ Glenn C. McGovern
Glenn C. McGovern (Bar# 9321)
Callan J. Johns (Bar# 38788)
Andrew Maberry (Bar# 38825)
2901 Division Street, Suite 201
Metairie, LA 70002
Phone: (504)456-3610
Fax: (504)456-3611
E-mail: glenn@glennmcgovern.com
*Attorneys for Plaintiffs*