UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WINSTON BOYD                                                    CIVIL ACTION

VERSUS                                                          NO. 25-80

ANN KIRKPATRICK, *et al.*                                       SECTION M (5)

## ORDER & REASONS

Before the Court is a motion to dismiss filed by defendants Ann Kirkpatrick, in her official capacity as superintendent of the New Orleans Police Department ("NOPD"), NOPD Officer Cramer Hanberg, NOPD Sergeant James Porter, NOPD canine training officer Harold Chambliss, and the City of New Orleans through Mayor Latoya Cantrell (collectively, "Defendants").[1] Plaintiff Winston Boyd responds in opposition,[2] and both sides reply in further support of their respective positions.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons, granting the motion as to Boyd's constitutional claims, and denying it as to his state-law claims.

## I.    BACKGROUND

This case arises from a police canine biting a citizen bystander on his own property.[4] On the night of January 22, 2024, NOPD officers pursued a vehicle occupied by armed carjacking

---

[1] R. Doc. 30. Plaintiff named the following defendants in the original complaint, but not the amended complaint: NOPD Officer Pittman, NOPD Officer Wink, Christopher Laine, Rasaad Ramine, Thomas Ripp, Jack Wilson, James Brady, and Adeja Carter. *Compare* R. Doc. 1 *with* R. Doc. 24. These defendants join in the motion to dismiss. R. Doc. 30. Plaintiff admits that he does not assert any claims against these defendants in the amended complaint. R. Doc. 35 at 7. Accordingly, to the extent that any claims asserted by plaintiff in the original complaint against Pittman, Wink, Laine, Ramine, Ripp, Wilson, Brady, and Carter survived the filing of the amended complaint, those claims are DISMISSED WITHOUT PREJUDICE.

[2] R. Doc. 35.

[3] R. Docs. 39; 50.

[4] The facts are taken from the amended complaint, the body worn camera ("BWC") footage, and the post-incident internal investigation report attached to the amended complaint, which details the BWC footage. *See* R. Docs.

suspects to Fig Street near its intersection with Mistletoe Street (in New Orleans), where the suspects abandoned the vehicle and fled on foot into the surrounding neighborhood.[5] Mistletoe Street is parallel to Hamilton Street, one city block to the west.[6] The NOPD canine unit was called to assist in searching for the suspects.[7]

Before the canine search began, Hanberg made three warning announcements using his police vehicle's loudspeaker.[8] Boyd, who was inside the detached garage at his home located at 3030 Hamilton Street, heard at least two of the announcements and then fell asleep in his chair.[9] At about 8:56 p.m., NOPD Officer Alexander Winks and his canine King began a systematic search of the area from the starting point at Fig and Mistletoe Streets and then proceeded into the 3000 block of Hamilton Street.[10] The search was unsuccessful.[11] Winks returned King to his cage in a marked NOPD vehicle at about 9:47 p.m.[12]

A few minutes later, at about 9:52 p.m., Porter, a sergeant with the canine unit, allowed Hanberg and his dog Nozem to search the same area covered by Winks and King.[13] The second search began at about 9:54 p.m.[14] Nozem was on a long lead of about 20 feet for the duration of the search.[15] As they neared the backyard of 3030 Hamilton Street, Hanberg announced, "Police

---

24; 24-7. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the district court should have viewed the facts in the light depicted by the videotape where the plaintiff's description of his driving was "blatantly contradicted by" video from the police car's dashboard camera); *Boyd v. McNamara*, 74 F.4th 662, 666 (5th Cir. 2023) ("Because video evidence is available, we are required to view the facts in the light depicted by the videotape." (quotation omitted)).

[5] R. Docs. 24 at 6; 24-7 at 10.

[6] R. Doc. 24-7 at 10.

[7] *Id.*

[8] *Id.* at 16.

[9] R. Doc. 24 at 5.

[10] R. Doc. 24-7 at 10. Officer Winks's name is spelled with an "s" in the investigation report, but the "s" was left off the name as listed in the original complaint.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 1, 10.

[14] *Id.* at 10.

[15] *Id.* at 14; R. Doc. 30-3.

with canine!"[16]  Upon entering the rear yard of Boyd's property, Nozem approached the detached shed, rounded the corner, and entered the building through an unlocked door, all out of Hanberg's sight.[17]  Hanberg heard growling (Nozem) and screaming (Boyd), and immediately ordered the then-unknown-to-him subject (which turned out to be Boyd) to come out of the shed.[18]  Hanberg opened the shed door, which was closed at the time, and saw Nozem biting the left thigh of Boyd, who was lying on the floor.[19]  Boyd struggled to push the dog away.[20]  Hanberg ordered Boyd to get his hands off the dog.[21]  Winks used his flashlight to illuminate the otherwise dark shed.[22]  As Winks placed a cuff on Boyd's right wrist, Boyd exclaimed, "I live here!"[23]  Hanberg gave three unsuccessful verbal release commands to Nozem, each in increasing intensity.[24]  Then Hanberg performed a tactical release to get Nozem off of Boyd.[25]  The entire encounter between Nozem and Boyd lasted approximately 36 seconds.[26]  Officers identified Boyd, who was then transported to the hospital for treatment.[27]

Thereafter, Porter instructed Hanberg and Nozem to continue searching for the armed carjacking suspects.[28]  At about 10:20 p.m., Nozem located one of the suspects, a juvenile, hiding underneath the raised residence at 3018 Hamilton Street, which is next door to Boyd's house at 3030 Hamilton Street.[29]  Before allowing Nozem to go under the house, Hanberg gave two "police

---

[16] R. Doc. 30-3.
[17] R. Docs. 24-7 at 14; 30-3.
[18] R. Docs. 24-7 at 14; 30-3.
[19] R. Docs. 24-7 at 14; 30-3.
[20] R. Docs. 24-7 at 14; 30-3.
[21] R. Docs. 24-7 at 14; 30-3.
[22] R. Docs. 24-7 at 14-15; 30-3.
[23] R. Docs. 24-7 at 15; 30-3.
[24] R. Docs. 24 at 7; 24-7 at 15; 30-3.
[25] R. Docs. 24 at 7; 24-7 at 15; 30-3.
[26] R. Docs. 24-7 at 14-15; 30-1 at 10; 30-3.
[27] R. Docs. 24 at 7; 24-7 at 10-11, 15.
[28] R. Doc. 24-7 at 11, 15.
[29] *Id.* at 11.

with a canine" warnings.[30]  When the suspect did not appear, Hanberg let Nozem go under the house where Nozem found the him.[31]  The suspect crawled out from under the house with Nozem still attached to his right shoulder.[32]  Nozem released the suspect on Hanberg's first verbal command.[33]  The suspect was transported to the hospital for treatment and booked with various crimes.[34]

On February 24, 2024, the NOPD public integrity bureau issued an investigation report on the "serious use of force" involving canine bites that occurred on January 22, 2024.[35]  After reviewing the BWC footage, statements from the officers involved (including Hanberg and Winks), and statements from Boyd and his wife, the investigators found that the NOPD appropriately used canines to search for the armed carjacking subjects and gave proper warning announcements prior to deploying the dogs.[36]  The report concluded that:

> The entry into the shed at 3030 Hamilton Street and the subsequent engagement of the homeowner, while unfortunate, was not the result of handler or canine error. The location of the shed was mere feet from where the actual suspect was later apprehended.  The shed door appeared to have been unlocked and opened, with all interior lights off.  It was deemed reasonable that "Nozem" was allowed to enter into and clear this structure.
>
> The second engagement [*i.e.*, the one with the carjacking suspect] was also deemed to be both reasonable and free from handler or canine error.
>
> Note: The failure to adhere to release commands and the subsequent need to employ a tactical release were not the result of handler error, but instead the canine's decision to override his training and follow his animal instinct.[37]

---

[30] *Id.* at 15.
[31] *Id.*
[32] R. Docs. 24-7 at 15; 30-3.
[33] R. Docs. 24-7 at 11; 30-3.
[34] R. Doc. 24-7 at 11.
[35] *See id.* at 1-24.
[36] *Id.*
[37] *Id.* at 21.

4

Boyd filed this suit alleging various constitutional and state-law claims against Defendants.[38]  First, Boyd alleges against Hanberg a claim under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from the use of excessive force.[39]  Boyd claims that the bite and its duration each constituted an excessive use of force.[40]  Further, Boyd asserts that Chambliss and Porter, as supervisors, are liable under § 1983 for the violations of his constitutional rights because they failed to provide proper training for, and supervision over, canine officers.[41]  Next, Boyd alleges a *Monell* claim against Kirkpatrick, claiming that she failed to properly screen, hire, train, investigate, and discipline officers.[42]  Finally, Boyd alleges that Defendants are liable for violations of the Louisiana constitution and other state-law claims, including negligence, "assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, loss of liberty, and violation of the rights to be secure against unreasonable stops, seizures, and the unjustifiable and excessive use of force, and the right to due process of law."[43]

## II.    PENDING MOTION

Defendants move to dismiss the complaint, arguing that Hanberg, Chambliss, and Porter are entitled to qualified immunity as to Boyd's § 1983 claim because Hanberg did not use excessive, or any, force on Boyd and acted reasonably in effectuating Nozem's release.[44]  In making this argument, Defendants rely on *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004), in

---

[38] R. Doc. 24.

[39] *Id.* at 8-13.  Boyd references the Fourteenth Amendment as making the Fourth Amendment applicable to the states and also asserts that the incident deprived him of his Fourteenth Amendment rights to due process and equal protection of the law.  *Id.* at 9-10. Boyd claims that Hanberg used excessive force.  The Supreme Court has stated that the constitutionality of challenged applications of force are analyzed "solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person," and not the Fourteenth Amendment's guarantees of due process and equal protection.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[40] R. Doc. 24 at 9.

[41] *Id.* at 10-13.

[42] *Id.* at 13-27.

[43] *Id*. at 27-28 (quote at 27).

[44] R. Doc. 30-1 at 8-10.

which the Sixth Circuit held that no Fourth Amendment seizure occurred when a police dog spontaneously bit the wrong person during a search for a fugitive because the canine handler officer did not "intentionally apply" the force to stop the plaintiff's movement.   Likewise, Defendants here contend that Hanberg did not intentionally apply force when Nozem mistakenly bit Boyd.[45]  Defendants further posit that the length of the bite, approximately 36 seconds, was not unreasonable under the *Graham* factors considering that Hanberg was searching for armed carjacking suspects when Nozem encountered someone in a dark garage.[46]  In that short time, say Defendants, Hanberg was able to assess the situation, determine that Boyd was not a threat, and obtain Nozem's release.[47]  Further, Defendants point out that they are not aware of any "authority clearly established at the time of the [alleged] violation that held that an accidental canine bite which is released 36 seconds later violated the Fourth Amendment."[48]  Moreover, Defendants argue that Boyd does not have factual support for his allegations that Chambliss and Porter failed to properly train Hanberg, nor can their alleged post-event actions concerning the assessment of the situation have caused a violation of Boyd's constitutional rights.[49]  With respect to Boyd's *Monell* claim against Kirkpatrick, Defendants argue that Boyd fails to allege a sufficient pattern to establish a custom or practice amounting to deliberate indifference with respect to the screening, hiring, and training of canine officers.[50]  Finally, Defendants argue that Boyd does not allege facts to support any of his state-law claims.[51]

In opposition, Boyd argues that this Court should deny, or defer ruling on, the motion to dismiss until additional discovery regarding the NOPD's training, disciplinary, and hiring

---

[45] *Id.* at 10.
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 11-12.
[50] *Id.* at 12-15.
[51] *Id.* at 15.

practices, particularly as related to the individual defendants and Nozem, is completed.[52] Alternatively, Boyd argues that Hanberg, Chambliss, and Porter are not entitled to qualified immunity.[53]   Boyd contends that, under the *Graham* factors, Hanberg used excessive force on Boyd – a sleeping, unarmed citizen who posed no threat – when Hanberg allowed Nozem to track ahead of him and bite Boyd, and was forced to use a tactical release after Nozem failed to heed to the verbal release commands.[54]   Boyd cites *Smith v. Lee*, 599 F. Supp. 3d 440, 456 (W.D. La. 2022), for the proposition that an officer is not entitled to qualified immunity when his canine accidentally bites the wrong person while searching for a suspect.[55]   Boyd then attempts to distinguish *Dunigan* on the facts, surmising that Nozem, unlike the dog in *Dunigan*, could not have perceived Boyd as a threat.[56]   Also, Boyd, citing two district court cases on prolonged police dog bites, argues that the length of the bite – 36 seconds – was excessive.[57]   Further, Boyd contends that he has stated claims against Porter, Hanberg, and Kirkpatrick for failure to train on proper canine deployment and release tactics.[58]   To establish a pattern of NOPD canines failing to adhere to verbal release commands, Boyd points to three examples that include his bite and that of the juvenile suspect.[59]   Moreover, Boyd maintains that he has stated a failure-to-supervise claim against Chambliss and Porter because they improperly reviewed the incident in question.[60]   Finally, Boyd posits that he alleges sufficient facts to support his various state-law claims.[61]

---

[52] R. Doc. 35 at 1, 4-7, 19.
[53] *Id.* at 7-17.
[54] *Id.* at 7-13.
[55] *Id.* at 13-14.
[56] *Id.* at 13-16.
[57] *Id.* at 11-12.
[58] *Id.* at 18-23.
[59] *Id.* at 21-23.
[60] *Id.* at 23-25.
[61] *Id.* at 25.

Defendants reply, arguing that discovery is not required to resolve their motion because, they say, the BWC footage shows that there was no excessive force.[62]  Defendants also point out that the Fifth Circuit reversed the district court's opinion in *Smith* and held that the use of force in that case was reasonable.[63]  Additionally, Defendants assert that the dog bite here was much shorter than the bites at issue in the cases cited by Boyd.[64]  Finally, Defendants contend that Boyd fails to allege a *Monell* claim against Kirkpatrick because he does not show an express policy of inadequate training – which Defendants say does not exist – nor are Boyd's three examples of dogs failing to release on verbal command sufficient to allege a pattern that constitutes deliberate indifference.[65]

Boyd files a surreply, arguing that this Court should not rule on Defendants' motion to dismiss until the magistrate judge rules on Boyd's pending motion to file another amended complaint.[66]  He also reurges his position that more discovery is required before the Court rules on the motion to dismiss.[67]  Finally, Boyd contends that the Fifth Circuit's holding in *Smith* is distinguishable, and thus not controlling, because the officer there thrice announced the commencement of the canine search, which, says Boyd, Hanberg failed to do.[68]

## III.    LAW & ANALYSIS

### A.  Rule 12(b)(6) Standard

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).   Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

---

[62] R. Doc. 39 at 1-4.
[63] *Id.* at 5-6 (citing *Smith v. Lee*, 73 F.4th 376 (5th Cir. 2023)).
[64] *Id.* at 4-5.
[65] *Id.* at 7-11.
[66] R. Doc. 50 at 1-3 (referencing R. Doc. 41).
[67] *Id.* at 3-4, 5-8.
[68] *Id.* at 4-5.

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id*. (quoting *Twombly*, 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying

pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. "'[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Body by Cook, Inc. v. State Farm Mut. Auto. Ins*., 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist*., 675 F.3d 849, 854 (5th Cir. 2012)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 338 (5th Cir. 2008); see also *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc*., 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see McWashington v. Rodgers*, 2025 WL 1124752, at *4 (S.D. Tex. Apr. 15, 2025) (holding that court

could consider officer BWC footage because it was referred to in the complaint and central to the plaintiff's claim).

## B. Further Discovery is Unnecessary

Boyd contends that further discovery is necessary to rule on Defendants' motion, which raises a qualified immunity defense. The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). To that end, the Fifth Circuit has, in some limited cases, "authorized discovery narrowly tailored to rule on defendants' immunity claims." *Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022) (quotation and alteration omitted). The court describes "that limited-discovery process as a careful procedure, which permits a district court to defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Id.* (quotation omitted). In other words, to allow limited discovery that is "narrowly tailored to uncover only those facts needed to rule on the immunity defense," "[t]he district court must first find that the plaintiff has pleaded facts which, if true, would overcome the defense of qualified immunity," and then "still find[] itself unable to rule on the immunity defense without further clarification of the facts." *Id.* (quotations omitted).

However, in *Carswell*, the Fifth Circuit recognized that *Iqbal* changed this landscape by "squarely prohibit[ing] interpreting [the] 'careful procedure' as allowing tailored discovery before a district court rules on an official's motion to dismiss." *Id.* at 312. Accordingly, because qualified immunity must be determined at the earliest possible stage of the proceedings, post-*Iqbal*, the district court may not defer ruling on the qualified immunity defense and permit discovery until it has determined that the plaintiff has pleaded facts sufficient to overcome it. *Id.* In sum, if the pleadings are insufficient to overcome the defense, the district court must grant the motion to

dismiss without the benefit of pre-dismissal discovery.  *Id.*  Conversely, if the pleadings are sufficient to overcome the defense, the district court must deny the motion without the benefit of discovery.

Here, no discovery is warranted.  As discussed below, the pleadings, along with the BWC footage and post-incident investigation report, are insufficient to overcome the qualified immunity defense.[69]  Thus, this Court must grant the motion to dismiss without the benefit of pre-dismissal discovery.  Moreover, the Court finds that no discovery is necessary with respect to Boyd's *Monell* claim because there was no constitutional violation upon which such a claim could rest.

### C.  Boyd's Fourth Amendment Claim against Hanberg, Chambliss, and Porter

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States.  42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  The statute is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999).  To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.  *Sw. Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).  "Claims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

---

[69] The post-incident investigation report (R. Doc. 24-7) was incorporated into the complaint by reference. *See* R. Doc. 24 at 6.  That report relies heavily upon the BWC footage.  *See* R. Doc. 24-7.

Here, Boyd brings § 1983 claims against Hanberg, Chambliss, and Porter, in their individual capacities; Kirkpatrick, in her official capacity as superintendent of the NOPD; and the City. Hanberg, Chambliss, and Porter argue that Boyd's claims against them must be dismissed because they are entitled to qualified immunity. Kirkpatrick and the City contend that Boyd has not pleaded a *Monell* claim against them.

### 1. Qualified Immunity

Qualified immunity (as distinct from absolute immunity) "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The defense "provides government officials with immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Smith v. Lee*, 73 F.4th at 381 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). It "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

Qualified immunity requires a two-step analysis. First, courts ask "whether the plaintiff has alleged a violation of a constitutional right." *Smith*, 73 F.4th at 381 (citing *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)). Then, "[i]f so, [courts ask] whether the right was clearly established at the time of the violation." *Id.* (citing *Cooper*, 844 F.3d at 522). "Both questions are matters of law." *Id.* (citing *Cooper*, 844 F.3d at 522). Generally, to satisfy the "clearly established" prong, a plaintiff must identify a case, or body of relevant case law, in which an officer acting under similar circumstances was held to have violated the Constitution. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020). In other words, "the unlawfulness of the challenged conduct

13

must be beyond debate." *Id.* (quotation omitted). Hence, courts "cannot deny qualified immunity without identifying a case in which an officer acting under similar circumstances was held to have violated the [right at issue], and without explaining why the case clearly proscribed the conduct of that individual officer." *Id.* at 345.

### 2. Boyd's Excessive Force Claim against Hanberg

Boyd alleges that Hanberg violated his right to be free from excessive force by allowing Nozem to enter Boyd's shed and bite him during the search for the carjacking suspects. To prevail on his excessive force claim, Boyd must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Smith*, 73 F.4th at 384 (quotation omitted). An officer must assess the need for force along with "the relationship between the need and the amount of force used." *Id.* (quotation omitted). "The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed." *Id.* (quotation omitted). The bite wounds and lacerations to Boyd's leg amount to a constitutionally cognizable injury and Hanberg allegedly used force when Nozem bit Boyd during the search for the suspected carjackers. *See id.* at 384-85 (finding that a dog bite and cuts were "a constitutionally cognizable injury" and that officer used force by releasing a police dog into a house to do a search with instructions to bite whomever he encountered). "Whether the force used was 'excessive' or 'unreasonable' depends on 'the facts and circumstances of this particular case.'" *Id.* at 385 (quoting *Graham*, 490 U.S. at 396) (alteration omitted). The reasonableness of the force is determined by applying the *Graham* factors: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

Here, Boyd has not alleged the violation of a constitutional right – particularly, the right to be free from excessive force.  This case is factually similar to *Smith*, where the Fifth Circuit found that there was no constitutional violation.  *Id*. at 385-87.  In *Smith*, the Shreveport Police Department ("SPD") received a tip that Christian Combs, a murder suspect, was hiding in one of two houses on State Street.  *Id*. at 379.  Officers fruitlessly searched the first house and then proceeded to the second, which was the home of plaintiff Juanita Smith.  *Id.*  SPD corporal Derek Barker and two other officers knocked on Smith's door, and when she answered, they explained that they were looking for Combs.  *Id.*  The officers asked Smith if anyone else was inside the home.  *Id.*  She said "no," but later stated that she believed the question referred only to Combs. *Id.*  At some point, while Smith was outside of her home, SPD corporal John Lee, a canine officer, asked Smith if anyone else was inside the house and then entered the structure with his dog, Dice. *Id.*  Lee claimed that, at the front door, he gave three loud warnings to anyone inside that a police dog was present and they should come out and identify themselves, with the third warning adding that the dog would enter and bite.  *Id.*  Smith later said she did not hear the warnings.  *Id.*  Lee then entered the house with Dice and instructed Dice to bite anyone he found inside.  *Id.* at 379-80. After entering, Dice found plaintiff, Floyd Stewart, who was awakened when he heard noise outside and put on his shoes.  *Id.* at 380.  Lee lost sight of Dice when Dice entered the room that Stewart occupied.  *Id.* Dice bit Stewart as Stewart was leaving the room.  *Id.*  Lee heard Dice engage someone, proceeded toward the sound, and immediately got Dice to release the bite when he realized that person was not Combs.  *Id.*  Stewart claimed that Dice bit him multiple times, that Lee did not immediately command Dice to stop, and that the incident lasted at least a minute before Lee commanded Dice to release the bite.  *Id.* Stewart sustained puncture wounds and lacerations to his left thumb, left calf, and left thigh.  *Id.*  Stewart sued Lee, the City of Shreveport, and two

other officers, alleging claims for unlawful entry, excessive force, and failure to train, along with various state-law claims. *Id.* Defendants moved for summary judgment, asserting qualified immunity on behalf of the individual defendants, including Lee, and seeking dismissal of plaintiffs' *Monell* and state-law claims. *Id.* The district court granted the motion as to the *Monell* claim against the City of Shreveport and the claims against one officer but denied it as to the claims against Lee and the other officer. *Id.* An appeal followed.

Relevant here, on appeal, the Fifth Circuit reversed the district court's denial of Lee's motion for summary judgment on Stewart's excessive force claim. *Id.* at 385-87. The appellate court found that the district court improperly applied the *Graham* factors to Stewart (the plaintiff), when they should have been applied to Combs (the suspect). *Id.* at 385. The court further held that, when the *Graham* factors were applied to Combs, Lee's decision to use Dice with the command to bite and hold the first person he found inside the house was reasonable, because: Combs was wanted for second degree murder (a severe offense); the arrest warrant said that Combs shot and killed another man and the tipster said Combs was armed, which gave officers reason to believe that he was dangerous; and officers believed Combs was hiding. *Id.* Thus, held the *Smith* court, Stewart did not allege "a constitutional violation for any force used between the time Lee entered Smith's house and the time he realized that the person Dice was biting was not Combs." *Id.*

The same holds true here. In this case, the *Graham* factors must be applied to the armed carjacking suspects who were attempting to evade capture, not to Boyd. When that is done, it is clear that Hanberg's actions were reasonable. As a preliminary matter, before the canine search began, Hanberg, using a megaphone or similar device, gave three loud canine search warnings to the surrounding community, and Boyd heard at least two of them. He also announced his presence

16

when entering Boyd's backyard.   Turning to the *Graham* factors, the Court first considers that Hanberg was searching for suspected carjackers, which is a serious crime.   Second, those carjacking suspects were thought to be armed, posing a risk to the safety of the officers and others.   Third, the carjacking suspects were attempting to evade arrest by flight.   Under these circumstances, as in *Smith*, it was reasonable for the NOPD to use canines to ferret out the suspects.   Also, as in *Smith*, when Nozem reacted to Boyd in a dark shed and out of Hanberg's sight, Hanberg was justified in believing that Nozem had found one of the suspects.   Hanberg acted appropriately in quickly assessing the situation and obtaining Nozem's release as soon as he concluded that Boyd was not one of the armed carjacking suspects.   The length of Boyd's encounter with Nozem was only 36 seconds, less than the minute-long interaction between Stewart and Dice that the Fifth Circuit condoned in *Smith.*   Thus, under controlling and virtually identical Fifth Circuit precedent, Hanberg did not violate Boyd's Fourth Amendment right to be free from excessive force.   And, because there was no constitutional violation, Hanberg is entitled to qualified immunity.

### 3.   Boyd's Supervisor Claims against Chambliss and Porter

Boyd seeks to hold Chambliss and Porter, Hanberg's supervisors, liable for Hanberg's alleged constitutional violation.   "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor acted, or failed to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates."   *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quotation omitted; emphasis in original).   "A supervisor may also be liable for failure to supervise or train if: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."   *Id.*   (quotation omitted).   Because the

foundational requirement for supervisory liability is that there has been an underlying constitutional violation by a subordinate, and this Court has found that Hanberg did not violate Boyd's constitutional rights, Boyd's supervisor claims against Chambliss and Porter must be dismissed. *Howard v. Woods*, 2019 WL 11648709, at \*12 (N.D. Tex. June 28, 2019) ("Without a non-frivolous allegation that his constitutional rights were violated, [a plaintiff] cannot state a claim for supervisory liability.") (citing *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992)). Consequently, Chambliss and Porter are entitled to qualified immunity as to any such claims.

### D. Boyd's *Monell* Claim against Kirkpatrick and the City

When a § 1983 claim is brought against a public official in his or her individual or official capacity, the governmental entity that the official serves is the real party in interest in an official-capacity suit, and such claims are analyzed under the *Monell* doctrine. *Hafer v. Melo*, 502 U.S. 21, 23, 25 (1991). In *Monell*, the Supreme Court held that a governmental entity is liable under § 1983 only when the entity itself caused the constitutional violation at issue. 436 U.S. at 694. To succeed on an official-capacity claim under *Monell* (*i.e.*, the claim against the governmental entity), the plaintiff must establish: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Valle v. City of Hous.*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quotation omitted). "A municipality cannot be held liable under a theory of *respondeat superior*." *York v. Welch*, 2024 WL 775179, at \*2 (5th Cir. Feb. 26, 2024) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22 (1988)). Thus, "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (quotation and alterations omitted).

Boyd cannot maintain a *Monell* claim against Kirkpatrick or the City because, as discussed above, there was no constitutional violation. As the Fifth Circuit has said, "[i]t is well established that to recover against a municipality under § 1983, a plaintiff must allege and establish that he sustained a deprivation of a constitutional or other federally protected right because of some official policy, practice, or custom of that governmental entity." *Rusanowsky v. City of Dall.*, 2025 WL 855317, at *5 (5th Cir. Mar. 19, 2025) (quotation omitted). "Without a predicate constitutional violation, there can be no *Monell* liability." *Id.* (quotation and alteration omitted). Thus, because Boyd cannot show that he suffered a constitutional violation from any use of force, his *Monell* claim against Kirkpatrick and the City must be dismissed.[70] *Id.*

### E. Boyd's State-Law Claims

The remaining claims in this matter are state-law tort claims involving nondiverse parties.[71] Section 1367 empowers a federal district court in a civil action to exercise supplemental jurisdiction over state-law claims that are so related to an accompanying federal claim within the court's original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a). But a court may decline to exercise such jurisdiction. In determining whether to decline to exercise supplemental jurisdiction over related state-law claims, a court should consider the four statutory factors set out in § 1367(c) – namely, (1) whether the state-law claims raise a novel or complex issue of state law, (2) whether the state-law claims substantially predominate over the claims affording original jurisdiction, (3) whether the court has dismissed all claims over which it

---

[70] In addition, the Court notes that the three instances of supposedly improper NOPD canine bites that Boyd identifies are insufficient to establish a pattern sufficient to state a *Monell* claim. *See Benfer v. City of Baytown*, 2023 WL 6465870, at *15-17 (S.D. Tex. Oct. 4, 2023) (holding that alleging five instances of dog bites spanning four years that were not shown to have specificity and similarity was insufficient to "give rise to a persistent, widespread practice so common and well settled as to constitute a custom that fairly represents a municipal policy" (quotation omitted)), *aff'd*, 120 F.4th 1272, 1285-86 (5th Cir. 2024).

[71] In one short paragraph, Defendants argue that Boyd's myriad state-law claims should be dismissed because he does not allege sufficient facts to support those claims. R. Doc. 30-1 at 15. Defendants' argument is too thin for this Court to undertake an analysis of the sufficiency of Boyd's allegations as to each state-law claim.

has original jurisdiction, or (4) whether, in exceptional circumstances, there are other compelling reasons for declining jurisdiction – as well as the common-law factors of judicial economy, convenience, fairness, and comity, with no single factor being dispositive. *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). As a general rule, a court should dismiss state-law claims when the federal claims to which they are pendent have been dismissed. *Id.* at 161 (citing, *inter alia*, *Carnegie-Mellon*, 484 U.S. at 351, and *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992)). "[B]ut this rule is neither mandatory nor absolute; no single factor is dispositive, and [the Fifth Circuit] review[s] the district court's decision in light of the specific circumstances of the case at bar." *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

Here, although this Court has dismissed all pending claims over which it had original jurisdiction and state-law claims now predominate, in the interest of judicial economy and fairness, the Court will retain jurisdiction over Boyd's state-law claims for now while the magistrate judge considers Boyd's motion for leave to file another amended complaint that seeks to raise a different constitutional claim. 28 U.S.C. § 1367(c)(2)-(4). But, if the magistrate judge denies the motion, the Court will decline to exercise supplemental jurisdiction over Boyd's state-law claims because comity would then weigh in favor of allowing the state-law claims between Louisiana citizens to proceed before a Louisiana state court.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion to dismiss (R. Doc. 30) is GRANTED as to Boyd's Fourth and Fourteenth Amendment claims against Hanberg, Porter, Chambliss, Kirkpatrick, and the City, and such claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the motion is DENIED, for now, as to Boyd's state-law claims against all Defendants.

New Orleans, Louisiana, this 14th day of May, 2025.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE